**Enoch ROBINSON, Petitioner,**

v.

**Charles L. WOLFF, Jr.,\* Warden, Nebraska Penal and Correctional Complex, Respondent.**

**Civ. No. 1713 L.**

United States District Court,
D. Nebraska.

Feb. 14, 1972.

---

\* On the court's own motion the named respondent has been changed to reflect the present warden of the Nebraska Penal and Correctional Complex.

William D. Kuester, Lincoln, Neb., for petitioner.

Melvin Kammerlohr, Asst. Atty. Gen., for respondent.

## MEMORANDUM OF DECISION

URBOM, Chief Judge.

The petitioner, Enoch Robinson, is incarcerated in the Nebraska Penal and Correctional Complex. He is serving a sentence of life imprisonment imposed by the District Court of Thurston County, Nebraska, after a jury found him guilty of first degree murder.

His conviction and sentence were affirmed on direct appeal. State v. Robinson, 185 Neb. 64, 173 N.W.2d 443 (1970). Although he has not availed himself of the remedies offered by the Nebraska Post-Conviction Act, §§ 29–3001 to 3004, R.R.S.Neb., he did file a habeas corpus

action in the District Court of Lancaster County in which he asserted that the State of Nebraska lacked jurisdiction to try him for the offense which led to his incarceration. A dismissal of that petition was affirmed by the state supreme court. Robinson v. Sigler, 187 Neb. 144, 187 N.W.2d 756 (1971).

In his present petition the petitioner raises a number of issues which he contends serve to render his present confinement constitutionally invalid. These may be placed into three general categories:

1. The State of Nebraska had no jurisdiction to try the petitioner for the offense charged.

2. The jury selection system of Thurston County, Nebraska, systematically excludes Indians from the jury panel, thereby depriving the petitioner of his right to be tried by a fair and impartial jury of his peers.

3. There were constitutional errors in the trial.

As to the issue numbered 3, the petitioner has alleged these specific claims:

a. The instructions of the trial court could only tend to convict;

b. The trial court refused to give the defendant's requested instructions;

c. The trial court refused to grant the defendant a change of venue;

d. The admission of a photograph which could only serve to inflame the passions of the jury;

e. The admission into evidence of the deceased's bloodstained clothing which was in a putrid and deteriorated state;

f. The trial judge made an improper comment as to the importance of a state's witness' testimony;

g. There was no evidence of premeditation presented at the preliminary hearing and the defendant was therefore improperly tried on the charge of first degree murder;

h. The petitioner's trial counsel was ineffective;

i. The prosecution knowingly suppressed evidence favorable to the petitioner;

j. The prosecution knowingly used false and perjured testimony;

k. The petitioner was denied the right to counsel during his sentencing.

The facts surrounding the petitioner's conviction have been fairly set forth by the Supreme Court of Nebraska:

"The defendant, the deceased, and several of the witnesses are Omaha Indians. All of the Indians involved were residents of or staying temporarily in the vicinity of Macy, Thurston County, Nebraska. They were drinking, primarily beer, throughout the afternoon and evening of Sunday, January 12, 1969. The deceased Norman Grant was a physically strong man, about 5 feet 9 inches in height, weighing in excess of 200 pounds, and 32 years of age, but his left arm had been amputated above the elbow. His party ran out of beer and several of them drove to Homer, Nebraska, to replenish their supply. As Norman Grant entered a Homer tavern about 4 or 4:30 p. m., he was accosted by the defendant who had a knife in his sleeve and placed it against Norman's neck informing Norman that: ' * * * he had a knife to his neck.' Norman knocked the defendant's arm up and then knocked him down. Defendant was ejected. A short time later Norman Grant's brother Donald was assaulted by defendant outside the tavern. In the struggle, defendant dropped the knife which was picked up by another member of the party and left with the bartender.

"Later that night, at approximately 1 a. m. on January 13, 1969, Norman Grant and another brother Mathew Grant left the home of friends in Macy and walked toward their own home in that village. They were overtaken by the defendant and a sister of the de-

fendant. Defendant asked them: '* * * if we wanted to settle it now.' He had an object in his hand and swung at Mathew Grant who backed away. He then went after Norman who kept backing away for a considerable distance but was steadily pursued by defendant. In the meantime, defendant's sister struck Mathew with a club of some nature, inflicting a cut on his scalp. Mathew ran away but returned when defendant and his sister left the scene. He found Norman injured and bleeding; and helped him walk to the house of an acquaintance who was aroused and conveyed them to the hospital at Winnebago, Nebraska. There a nurse examined Norman, found he was dead, and called a doctor who verified that fact. The doctor also sutured Mathew's scalp wound.

"The county sheriff was called. After viewing the body and talking with the doctor and Mathew Grant, he met an investigating officer of the Nebraska State Patrol at the hospital and they proceeded to Macy. On arriving at Macy about 4 a. m., they checked the scene of the crime and found numerous blood stains in the snow and a blood-stained knife blade broken in three parts.

"On the afternon of January 13, 1969, defendant went to the home of a teacher in a local churchschool and asked to use the phone saying: 'My name is Enoch Robinson and I want to turn myself in, I want to call the police.' The teacher then called for the sheriff. Defendant remained there until the arrival of the sheriff. While waiting, defendant was asked by the teacher what had happened. Defendant said: '* * * He had been in a fight, he guessed he had used a knife * * *.'

"Defendant testified in his own behalf. He indicated he was drunk and his memory very hazy about events occurring on January 12 and 13, 1969, but denied having injured Norman Grant.

"An autopsy was performed on the body of Norman Grant. The examining physician found lacerations on the right ear and cheekbone, the chin, and below the left eye. He also found stab wounds below the sternal notch, below the breastbone, and on the left side of the neck above the clavicle. The neck wound which was 3 inches in depth appears in photographs to have been at least 1 inch in length. He indicated the wounds were made with a pointed, narrow instrument such as a screwdriver or sharp paring knife. He also found that the left carotid artery and the left jugular vein had been severed as a result of the wound in the neck. Death was caused by bleeding from the neck wound.

"Two colored photographs of the blood covered face, head, and torso of deceased and one full length photograph were received without objection. One full length colored picture taken after the body had been washed was also admitted without objection. Defendant objected strenuously to the admission of a colored photograph taken during the course of the autopsy. Part of the flesh over the left chest, shoulder, and neck had been folded back and a forceps inserted through the wound in the neck to show its size and location. The picture was admitted as exhibit 13."

## EXHAUSTION OF STATE REMEDIES

The respondent contends that, as to several of the issues, the petitioner has not exhausted available state remedies.

■ As to the petitioner's first contention, that the State of Nebraska was without jurisdiction to try him, the Supreme Court of Nebraska has ruled adversely to that claim in the appeal from the habeas corpus action. In that case, the state supreme court affirmed the district court's dismissal of Robinson's habeas corpus petition. No evidentiary hearing was held in the district court. Counsel was appointed for appeal, and the supreme court did consider the

merits of Robinson's jurisdictional claim. The petitioner asserts that an evidentiary hearing should be held, as one was not granted in the state court. However, I think that no hearing is necessary, as the only questions presented are questions of law.

The petitioner's second ground for relief, that the jury selection system of Thurston County, Nebraska, systematically excludes Indians from jury panels, has never been presented to a state court for determination. The petitioner urges that in view of the recent Nebraska case of State v. Reichel, 187 Neb. 464, 191 N.W.2d 826 (1971), the petitioner is precluded from presenting that issue to the state courts. State v. Reichel held that after a first petition for post-conviction relief had been determined on the merits, the court need not entertain a second motion if that motion raises grounds that were available to the petitioner at the time of his first motion, even though those grounds may not have been presented in the first petition. That case was addressed only to successive petitions under the post-conviction act. It should not be inferred from that case that because the petitioner has once presented a petition for habeas corpus to the state courts he is thereby precluded from raising different grounds in a motion for post-conviction relief, when no prior post-conviction request has been presented.

The petitioner further contends that he is procedurally barred from raising the jury selection issue in the Nebraska courts, citing the well-established rule in Nebraska that "objections to the mode of selecting petit jurors must be made before the trial to be of avail." State v. Nelson, 182 Neb. 31, 38, 152 N.W.2d 10, 14 (1967). See also, State v. Eggers, 175 Neb. 79, 120 N.W.2d 541 (1963); Satterfield v. State, 172 Neb. 275, 109 N.W.2d 415 (1961); Davis v. State, 31 Neb. 247, 47 N.W. 854 (1891). However, none of these cases involved an objection to the constitutionality of the method of selecting petit jurors. In the recent case of State v. Gutierrez, 187

Neb. 383, 191 N.W.2d 164 (1971), the Nebraska Supreme Court noted the general rule, but went further to say:

"This failure, together with the fact that no challenge to the array appears, would ordinarily dispose of the question; however, since a constitutional question may be involved, that facet of the problem will also be considered."

The court then proceeded to a decision on the merits of the claim. Accordingly, it appears that the state courts will consider the merits of a constitutional claim presented. Furthermore, the building of a factual record will be enhanced if the petitioner first presents his claim to the state courts. Burnside v. Sigler, 451 F.2d 987 (C.A. 8th Cir. 1971).

The additional argument of the petitioner that he cannot receive a fair trial in the state court on the jury selection issue is without any factually asserted basis. This court is loath to assume that a state court will not fairly assess a constitutional claim properly presented to it. It cannot fairly deal with the issue if it is not given the opportunity.

The same defect appears with three of the errors alleged to have occurred at the trial—that his trial counsel was ineffective, that the prosecution suppressed evidence favorable to the petitioner, and that the prosecutor knowingly used perjured testimony. As to those issues, available state remedies have not been utilized.

I conclude that the foregoing issues, except that regarding jurisdiction, must be dismissed for failure to exhaust available state remedies. Chavez v. Sigler, 438 F.2d 890 (C.A. 8th Cir. 1971). See Herring v. Rodriguez, 372 F.2d 470 (C.A. 10th Cir. 1967).

## JURISDICTION

It is the petitioner's contention that the State of Nebraska was without jurisdiction to try him for an offense committed by an Indian against another Indian within the territorial confines of the Omaha Indian Reservation.

A resolution of the question presented turns upon the constitutional validity of Public Law 280, 18 U.S.C.A. § 1162(a), which purported to give to the states listed jurisdiction over offenses committed by or against Indians in the areas of Indian country. Nebraska was one of the listed states. It has been held in Anderson v. Gladden, 293 F.2d 463 (C.A. 9th Cir. 1961), cert. denied 368 U.S. 949, 82 S.Ct. 390, 7 L.Ed.2d 344 (1961), that no affirmative action was required by any of the five states listed in the act before jurisdiction could be assumed by the states. As will be discussed more fully below, I concur in that view. This does not, however, answer fully the issue posed by the petitioner, for he has challenged the constitutionality of § 1162(a).

Briefly stated, it is the petitioner's argument that under the treaty of March 16, 1854 (10 Stat. 1043), the petitioner was granted the right to be under the exclusive jurisdiction of the United States; that his trial was a controversy "arising under" the treaty of 1854, within the judicial power of the United States by operation of Article III, Section 2, of the United States Constitution; and that a case or controversy arising under a treaty of 1854 could not be delegated to a state.

The petitioner additionally argues that the State of Nebraska could not have acquired criminal jurisdiction over offenses committed by or against Indians in Indian country unless the state first removed a constitutional impediment contained in the Nebraska Constitution and Enabling Act, thus requiring affirmative legislative action. The legislative history of § 1162(a) indicates that Congress noted that in some states there were impediments to the assumption of jurisdiction by the states. Those states were excluded from § 1162 (a) until such time as those impediments could be removed by legislation or constitutional amendment, as necessary. Further, those Indian tribes which did not wish to be placed under state criminal jurisdiction were excluded specifically from § 1162(a). Whether there was an impediment in the Nebraska Constitution is a question of Nebraska law and a resolution of that question by the Supreme Court of Nebraska is binding on this court. In Robinson v. Sigler, 187 Neb. 144, 187 N.W.2d 756 (1971), the Supreme Court of Nebraska considered whether affirmative action was required by the state to accept jurisdiction and found that:

"[B]y the legislation, Congress withdrew from the federal court jurisdiction over crimes affecting Indians on Indian Reservations in five specifically mentioned states. No acceptance was required of those states. The State of Nebraska, being one of them, had either concurrent or residual jurisdiction over the crime of which the appellant had been convicted, and full jurisdiction over such crime was returned to the State of Nebraska on passage of Public Law 280." 187 Neb. at 148, 187 N.W.2d at 759

To the extent that this statement relies on an interpretation of § 1162(a), I am in accord with that interpretation, for I find nothing in the language of the statute that indicates a requirement of acceptance by the states mentioned in the act. Implicit in the holding is a determination that nothing in the law of the State of Nebraska, including any so-called impediment, requires such acceptance. If the petitioner's present argument has been presented to the state courts of Nebraska, the question has been resolved adversely. If it has not been presented, this court would be unable to consider the question because the petitioner has not exhausted available state remedies with respect to that particular argument. Picard v. Connor, 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971).

In order to determine the question of the validity of § 1162(a) it is necessary to review briefly the history of the relationship of the Omaha Indian Tribe to the federal and Nebraska governments.

By treaty in 1854 the Omaha Indian Tribe ceded to the United States certain

lands in the Nebraska Territory. In return for the ceded land the United States was to compensate the tribe and reserve to it certain lands for its exclusive use. Article 10 of the treaty provided that the Omahas would acknowledge their dependence on the government of the United States and would not "make war on any other tribe, except in self defence, but will submit all matters of difference between them and other Indians to the government of the United States, . . ." This provision within the treaty was consistent with the idea that the relationship of the Indian tribes to the federal government was one of ward-guardian, or something similar. United States v. Klamath and Moadoc Tribes, 304 U.S. 119, 58 S.Ct. 799, 82 L.Ed. 1219 (1938).

■ The fact that a crime occurs on an Indian reservation does not in and of itself place that offense within the exclusive jurisdiction of the United States, unless the enabling act of the state by express language excludes Indian country from state jurisdiction. If the offense was not committed by an Indian, the state could exercise criminal jurisdiction. United States v. McBratney, 104 U.S. 621, 26 L.Ed. 869 (1881); Draper v. United States, 164 U.S. 240, 17 S.Ct. 107, 41 L.Ed. 419 (1896). Likewise, an offense committed by an Indian outside the territorial confines of an Indian reservation was within state criminal jurisdiction. DeMarrias v. State of South Dakota, 319 F.2d 845 (C.A. 8th Cir. 1963).

In 1885 the enactment of 18 U.S.C.A. § 1153 did grant to the United States exclusive jurisdiction over the crimes enumerated therein, if committed by an Indian on the territory of an Indian reservation. United States v. Kagama, 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 (1886); Kills Plenty v. United States, 133 F.2d 292 (C.A. 8th Cir. 1943).

Even assuming that Congress could have extended federal jurisdiction further than it did by enacting § 1153, it did not choose to do so. See Hollister v. United States, 145 F. 773 (C.A. 8th Cir. 1906); United States v. Martin, 14 F. 817 (U.S.D.C.Or.1883). Rather, only a portion of the congressional power was asserted; ten listed crimes committed by Indians in Indian country defined the limits of what concededly was a larger area within which Congress could act. Hallowell v. United States, 221 U.S. 317, 31 S.Ct. 587, 55 L.Ed. 750 (1911).

■ The enactment of § 1153 precluded the exercise of state criminal jurisdiction in the event of a crime committed by an Indian on an Indian reservation if the crime charged was one of the ten offenses enumerated within § 1153. Seymour v. Superintendent of Washington State Penitentiary, 368 U.S. 351, 82 S.Ct. 424, 7 L.Ed.2d 346 (1962). The offense for which the petitioner was tried by the State of Nebraska is a crime listed in § 1153A. The petitioner is an Omaha Indian, and the offense occurred within the territorial confines of the Omaha Indian Reservation. It is thus clear that in the absence of 18 U.S.C.A. § 1162(a), the petitioner could have been tried only by the United States for the offense charged. If § 1162(a) is unconstitutional, the petitioner is entitled to relief.

The petitioner's first argument broadly attacks the constitutionality of § 1162 (a) on the basis that Congress has no power to delegate the judicial power of the United States to the individual states. It is the petitioner's position that because the United States, by virtue of Article I, Section 8, Clause 3, of the United States Constitution, has the exclusive power to regulate commerce with the Indian tribes, the individual states are thereby precluded from regulating the affairs of Indians. I think it should first be noted that the language "regulate commerce . . . with the Indian tribes" should be read to say that and nothing more. Thus, the act of trying Enoch Robinson for the crime of murder could hardly be placed in the category of regulating commerce with an Indian tribe. The State of Nebraska was exercising its police power and I fail to see how this act in any way affected "commerce . . . with the Indian tribes." In other areas reserved

to the United States by Article I, Section 8, Clause 3, of the Constitution of the United States, the reservation of that power has not served totally to preclude exercise of state power in the same field. Cities Service Gas Company v. Peerless Oil & Gas Co., 340 U.S. 179, 71 S.Ct. 215, 95 L.Ed. 190 (1950); Huron Portland Cement Co. v. City of Detroit, Michigan, 362 U.S. 440, 80 S.Ct. 813, 4 L.Ed.2d 852 (1960). Even if the power of the United States to regulate Indian affairs be characterized as plenary or absolute, cf. Colliflower v. Garland, 342 F.2d 369 (C.A. 9th Cir. 1965), this power is one to be exercised by Congress and does not, by constitutional command, bring all affairs concerning Indians within the exclusive purview of the government of the United States. It is possible, and even probable, that by enactment of 18 U.S.C.A. § 1153 Congress chose to exercise less power than it constitutionally possessed. The question of the degree to which Congress should exercise its power over Indian affairs is a question, I think, for Congress and not for this court. I therefore conclude that Article I, Section 8, Clause 3, of the United States Constitution does not preclude the states, in the absence of legislation, from exercising some degree of control over Indian affairs in the exercise of the police power of the state.

The petitioner further argues that Congress has the sole power to conclude treaties with the Indian tribes. Such a treaty was concluded between the United States and the Omaha Indian Tribe on March 16, 1854. 10 Stat. 1043. Pointing to the treaty of 1854 as the basis of the relationship between the Omaha Indian Tribe and the government of the United States, the petitioner contends that Article III, Section 2, of the Constitution of the United States, which extends the federal judicial power to cases "arising under the Constitution, laws, or treaties of the United States," brings this case within the exclusive judicial power of the United States.

It is true that the defense of lack of state criminal jurisdiction is one which may have been available to the petitioner during his state court trial. The petitioner would go somewhat further and have the availability of this defense make the case one "arising under" a treaty, and therefore within the exclusive power of the federal judiciary. In determining whether the petitioner's case is one "arising under" a treaty, it is necessary to look to the treaty of 1854.

In construing an Indian treaty the apparent rule of construction to be observed is that "[t]he language should be construed in accordance with the tenor of the treaty." Northwestern Bands of Shoshone Indians v. United States, 324 U.S. 335, 353, 65 S.Ct. 690, 699, 89 L.Ed. 985 (1945). The court, then, should attempt to determine what the parties meant by the treaty. I believe that a fair reading of the treaty of 1854, including the phrase "will submit all matters of difference between them and other Indians to the government of the United States" can only be taken to mean that should a dispute arise between the Omahas and another tribe, or, at the broadest, between the Omaha Indians and non-Omaha Indians, the United States must act as arbiter. A claimed criminal act by Enoch Robinson, although occurring on an Indian reservation, is not a dispute between the Omahas and other Indians; it is a dispute between the State of Nebraska and an Omaha Indian. I cannot construe the treaty to say that each and every enrolled member of the Omaha Indian Tribe gained by the treaty an absolute right to be subject only to the criminal jurisdiction of the government of the United States.

It would appear that, even without a jurisdictional statute, federal jurisdiction may extend to cases arising under the Constitution, laws, or treaties of the United States. That is to say, jurisdiction may be founded upon the Constitution itself. Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969). But this does not mean that since jurisdiction may be founded in the federal court, the state thereby is precluded from exercising ju-

risdiction. Were the term "arising under" given so broad a construction, it is difficult to imagine a situation wherein some right arising under the Constitution, laws, or treaties of the United States could not be asserted. In the case of the petitioner his rights under the treaty of 1854 would have been collateral to the main issue at trial, and had a jurisdictional defense based on the treaty been asserted at trial, I do not believe it would have been enough to confer jurisdiction on the federal court, much less strip the state court of all power to try the case. Martinez v. Southern Ute Tribe of Southern Ute Reservation, 249 F.2d 915 (C.A. 10th Cir. 1957), cert. denied 356 U.S. 960, 78 S.Ct. 998, 2 L. Ed.2d 1067 (1958), rehearing denied 357 U.S. 924, 78 S.Ct. 1374, 2 L.Ed.2d 1376 (1958); Littel v. Nakai, 344 F.2d 486 (C.A. 9th Cir. 1965), cert. denied 382 U.S. 986, 86 S.Ct. 531, 15 L.Ed.2d 474 (1966); Kirk v. Kirk, 295 F.Supp. 1001 (U.S.D.C.Or.1968). The petitioner's case in the state court is clearly not one which can be said to "arise under" the Constitution, laws, or treaties of the United States within the ordinary meaning of the term. Cf. Devine v. Los Angeles, 202 U.S. 313, 26 S.Ct. 652, 50 L. Ed. 1046 (1906); Joy v. St. Louis, 201 U.S. 332, 26 S.Ct. 478, 50 L.Ed. 776 (1906).

In summary, then, I hold that the constitutionally reserved power of the United States to regulate commerce with the Indian tribes does not preclude the Congress from granting some measure of control over Indians and Indian affairs to the states, including the exercise of state criminal jurisdiction over offenses committed by Indians on Indian reservations; and that the fact that a right based upon a treaty may be asserted as a defense in a state criminal trial does not serve to strip the state courts of jurisdiction to try the offense.

An additional reason for so holding appears within the legislative history of § 1153. Those Indian tribes which objected to the assumption of criminal jurisdiction by the states wherein they resided were specifically excluded from the operation of § 1153. Letter from Orme Lewis, Assistant Secretary of the Interior to A. L. Miller, Chairman, Committee on Interior and Insular Affairs, July 7, 1953; 1953 U.S.Code Cong. & Admin.News, pp. 2413–14. To say that members of the Omaha Tribe of Indians were unable to alter or amend the terms of their prior relationship with the United States government would be to say that their rights were frozen by the treaty of 1854. This result would be totally contrary, I think, to the wishes of the tribal members who in 1953 did not evidence opposition to being within the criminal jurisdiction of the State of Nebraska. I do not believe it was the intent of the framers of the Constitution to determine inflexibly the status of Indians for all future times, nor do I believe such a result would be beneficial or desirable for the members of the Omaha Tribe.[1]

An additional challenge to the constitutionality of § 1162(a) is based on an argument that, in treating different tribes of Indians differently, the statute discriminates arbitrarily and therefore violates due process. Cf. Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1953). I think that even if I were to assume that § 1162(a) sets up an arbitrary classification in treating different tribes differently, something more must be shown before this classification could amount to a denial of due process of law.[2] To be a violation of due process it is necessary

---

1. This is not to say that the Omaha Indian Tribe affirmatively assented to an assumption of criminal jurisdiction by the State of Nebraska. There is no evidence before the court to indicate either way.

2. Certain classifications are automatically suspect, i. e., racial. McLaughlin v. Florida, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964). I do not believe that classification by tribe is such a suspect classification. Cf. Akers v. Morton, 333 F.Supp. 184 (D.C.1971).

that the discrimination be invidious—that is, the statute must operate to the detriment of the arbitrarily drawn class. United States v. Seeger, 380 U.S. 163, 188, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965) (Douglas, J., concurring).

■ There is no justification for assuming that it was in any way detrimental to the petitioner or to the Omaha Indian Tribe to be brought within state criminal jurisdiction, as this court cannot assume that the courts of the State of Nebraska would be any less solicitous of individual rights than would the federal courts. It is beyond question that "the state and federal courts have the same responsibilities to protect persons from violation of their constitutional rights, . . ." Brown v. Allen, 344 U.S. 443, 465, 73 S.Ct. 397, 411, 97 L.Ed. 469 (1953). Thus, the fact that some Indian tribes were placed under state criminal jurisdiction, while others remained under federal criminal jurisdiction by § 1162(a), does not amount to invidious discrimination. That section is therefore not violative of the due process clause of the Fifth Amendment to the Constitution of the United States.

On the basis of the foregoing, I conclude that 18 U.S.C.A. § 1162 is a constitutionally valid exercise of Congressional power, and that the State of Nebraska had criminal jurisdiction over the defendant at the time of his trial.

## ERRORS AT TRIAL

Before discussing the alleged trial errors, it is well to bear in mind the admonition of the Supreme Court in Townsend v. Sain, 372 U.S. 293, 312, 83 S.Ct. 745, 756, 9 L.Ed.2d 770 (1964):

> "State prisoners are entitled to relief on federal habeas corpus only upon proving that their detention violates the fundamental liberties of the person, safeguarded against state action by the Federal Constitution."

This statement is clearly in accord with the earlier statement of the Supreme Court in Gryger v. Burke, 334 U.S. 728, 731, 68 S.Ct. 1256, 1258, 92 L.Ed. 1683 (1948):

> "We are not at liberty to conjecture that the trial court acted under an interpretation of the state law different from that which we might adopt and then set up our own interpretation as a basis for declaring that due process has been denied. We cannot treat a mere error of state law, if one occurred, as a denial of due process; otherwise, every erroneous decision by a state court on state law would come here as a federal constitutional question."

■ It would not be enough, then, for the petitioner to show that certain actions of the trial court might be contrary to state law, or that sound policy would dictate a different result; it is only upon a showing of error of constitutional dimension that the petitioner will be entitled to federal habeas corpus relief. Wessling v. Bennett, 410 F.2d 205 (C.A. 8th Cir. 1969).

### a. Instructions to the jury.

It is the petitioner's contention that the trial court gave instructions which could only tend to convict and erred in failing to give the defendant's requested instructions. The trial court gave 17 separate instructions to the jury, but refused the only instruction offered by the defendant. That instruction covered the definition of reasonable doubt.

■ The rule regarding habeas corpus review of jury instructions is succinctly stated by the United States Court of Appeals for the Fifth Circuit:

> "Habeas corpus does not lie to set aside a conviction on the basis of improper jury instructions unless the impropriety is a clear denial of due process so as to render the trial fundamentally unfair. Higgins v. Wainwright, 424 F.2d 177, 178 (C.A. 5th Cir. 1970), cert. denied 400 U.S. 905, 91 S.Ct. 145, 27 L.Ed.2d 142, rehearing denied 400 U.S. 1002, 91 S.Ct. 463, 27 L.Ed.2d 455 (1971)

See also United States ex rel. Mintzer v. Dros, 403 F.2d 42 (C.A. 2nd Cir. 1968); Gomez v. Beto, 402 F.2d 766 (C.A. 5th Cir. 1968), cert. denied 394 U.S. 936, 89

S.Ct. 1217, 22 L.Ed.2d 469 (1969); Greyson v. Commonwealth of Kentucky, 333 F.2d 583 (C.A. 6th Cir. 1964); United States ex rel. Witherspoon v. Ogilvie, 337 F.2d 427 (C.A. 7th Cir. 1964), cert. denied 382 U.S. 861, 86 S.Ct. 122, 15 L.Ed.2d 99 (1965); Atwell v. Arkansas, 426 F.2d 912 (C.A. 8th Cir. 1970); Shepherd v. Nelson, 432 F.2d 1045 (C.A. 9th Cir. 1970); Ortiz v. Baker, 411 F.2d 263 (10th Cir. 1969), cert. denied 396 U.S. 935, 90 S.Ct. 279, 24 L.Ed.2d 234 (1969). Even though an instruction may be erroneous under the law of the state, that, without more, is not sufficient to show a violation of a constitutional right. Linebarger v. Oklahoma, 404 F.2d 1092 (C.A. 10th Cir. 1968), cert. denied 394 U.S. 938, 89 S.Ct. 1218, 22 L.Ed.2d 470 (1969). In the Eighth Circuit it appears that before habeas relief can be granted on the basis of a trial court's instructions to the jury, it must be shown that the instructions served to deprive a constitutional right, e. g., improperly placing the burden of proof on the defendant. Stump v. Bennett, 398 F.2d 111 (C.A. 8th Cir. 1968), cert. denied 393 U.S. 1001, 89 S.Ct. 483, 21 L.Ed.2d 466 (1968); Johnson v. Bennett, 386 F.2d 677 (C.A. 8th Cir. 1967), vacated 393 U.S. 253, 89 S.Ct. 436, 21 L.Ed.2d 415 (1968), on remand, 414 F.2d 50 (C.A. 8th Cir. 1969). I have examined the instructions given by the trial court and find that there is nothing therein which would serve to deprive the petitioner of his right to due process of law.

*b. Denial of defendant's motion for change of venue.*

On February 28, 1969, the defendant's trial counsel applied for a change of venue, alleging as grounds that the defendant already had other charges pending against him in Thurston County; that one of the witnesses, an elder in the Mormon Church, might unduly influence jurors who were members of his church with his trial testimony; that the deceased had numerous relatives in the area who would be known to potential jurors; and that the magistrate who presided at the preliminary hearing bound the defendant for trial on a charge of first degree murder in spite of a lack of evidence as to premeditation. Trial counsel thereby urged that bias and prejudice existed against the defendant in Thurston County.

On March 28, 1969, the court took evidence in favor of and in opposition to the application for change of venue. The record here does not reflect the evidence presented by the defendant. The prosecutor submitted 43 affidavits executed by local citizens, all stating that the affiants believed the defendant would receive a fair trial in Thurston County. The application for change of venue was overruled.

A motion for change of venue is addressed to the sound discretion of the trial court. United States v. Medlin, 353 F.2d 789 (C.A. 6th Cir. 1965); United States v. Lombardozzi, 335 F.2d 414 (C.A. 2nd Cir. 1962), cert. denied 379 U.S. 914, 85 S.Ct. 261, 13 L.Ed.2d 185 (1964). Before a denial of a motion for a change of venue would amount to a deprivation of a constitutional right, it would have to be shown that local conditions made it impossible for the defendant to receive a fair trial or that the trial itself was fatally infected by local prejudice or bias. Cf. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). No such situation is revealed by this record. To the contrary, the record reveals an orderly trial with no significant disruptions. There was no untoward difficulty in impaneling a jury. Thirty-seven prospective jurors were passed for cause, and both the state and the defendant exercised their maximum number of peremptory challenges, eleven and thirteen, respectively. Section 29–2005, R.R.S. Neb. (1964). This is in itself some indication that local conditions did not preclude a fair trial. Mayo v. Blackburn, 250 F.2d 645 (C.A. 5th Cir. 1957), cert. denied 356 U.S. 938, 78 S.Ct. 780, 2 L.Ed. 2d 813 (1958), rehearing denied 356 U.S. 978, 78 S.Ct. 1135, 2 L.Ed.2d 1152 (1958). In the absence of a showing that

a denial of the application for a change of venue in some way served to deprive the petitioner of a fair trial, the denial of the application is not grounds for habeas relief. Wolfe v. Nash, 313 F.2d 393, 397 (C.A. 8th Cir. 1963).

### c. Admission of evidence.

■ At the trial several color photographs of the deceased were admitted as evidence without objection. Vigorous objection was made to the admission of Exhibit 13, a color photograph taken after the autopsy had begun. A portion of the chest of the deceased had been dissected away and the thoracic cavity exposed. The purpose of the photograph, as stated by the examining physician, was "to show the exact location and size of the wound." Exhibit 13 was admitted. Exhibit 14, a similar photograph, showing the severed carotid artery, was offered and rejected.

The petitioner also contends that the jury was unduly prejudiced by the admission into evidence of the deceased's bloodstained clothing, which had apparently been kept sealed in a plastic bag which was not opened until the time of the trial. According to the petition, the clothing was decomposed and exuded a nauseous odor.

On direct appeal the petitioner argued that these exhibits, among others, were admitted into evidence even though they did not serve to prove or disprove any factual issue and could serve only to inflame the jury. In this court the petitioner further contends that the admission of these items into evidence deprived the petitioner of due process.

As I view the allegations of error as to the admission of Exhibits 13, 17 and 18, they do not rise to constitutional proportions and are within the area of wide discretion granted the states in developing their own substantive rules of evidence. Cf. Spencer v. Texas, 385 U.S. 554, 87 S.Ct. 648, 17 L.Ed.2d 606 (1967); Lisenba v. California, 314 U.S. 219, 62 S.Ct. 280, 86 L.Ed. 166 (1941).

### d. Comment of trial judge.

■ During the direct testimony of the deceased's brother, Donald F. Grant, the trial judge told the witness, "You are a very important witness in this case and we want you to speak slowly and distinctly so that the reporter can get every word you say down." It is the petitioner's contention that by this comment the trial judge indicated to the jury that the testimony was to be given extra weight or was more credible than that of other witnesses. It is enough to say that no objection to the remark was made at the time of trial. Further, it would appear that the remark of the judge was essentially neutral in character and did not indicate that Grant was a particularly credible witness or that his testimony was to be given special consideration by the jury. Courts are frequently required to request witnesses to speak more slowly or distinctly. That the court said that the witness was important does not show bias or prejudice on the part of the trial court. The allegation is without merit. United States ex rel. Castillo v. Fay, 350 F.2d 400 (C.A. 2nd Cir. 1965), cert. denied 382 U.S. 1019, 86 S.Ct. 637, 15 L.Ed.2d 533 (1966); United States ex rel. Colon v. Follette, 366 F.2d 775 (C.A. 2nd Cir. 1966).

### e. Lack of evidence as to premeditation.

■ The petitioner further contends that the tral court "erroneously failed to reduce the charge filed against petitioner even though there was totally insufficient evidence to convict the petitioner of the crime of first degree murder." There was evidence before the jury that the petitioner had threatened the deceased with a knife earlier in the evening before the murder occurred and that he had made a statement in the presence of Carroll Hamilton that "He was going to get a gun and get one of those guys." The jury was instructed on lesser included offenses. Thus, a

question of whether the evidence was sufficient to support a jury finding of guilty of first degree murder is not properly reviewable by this court. Moore v. King, 130 F.2d 857 (C.A. 8th Cir. 1942); Gemmel v. Buckhoe, 358 F. 2d 338 (C.A. 6th Cir. 1966).

### e. *Sentencing.*

 The petitioner claims that neither he nor his counsel was present at the time the trial court pronounced sentence. It is clear that in the federal courts the absence of the accused or his counsel at the time of sentencing is reversible error. United States v. Behrens, 375 U.S. 162, 84 S.Ct. 295, 11 L.Ed.2d 224 (1963). However, as pointed out in Mr. Justice Harlan's concurring opinion in that case, it is open to question whether this requirement is embodied in the Constitution. There is authority for the proposition that absence of defense counsel at sentencing, while not vitiating an otherwise valid conviction, will require resentencing in order constitutionally to validate incarceration pursuant to the sentence. Ellis v. Ellisor, 239 F.2d 175 (C.A. 5th Cir. 1956); Boggess v. Boles, 251 F.Supp. 689 (U.S.D.C.N.D.W.Va.1966). While I am inclined to the view that this is the correct rule, the record does not support the petitioner's contention that he was sentenced in absentia. The record does reflect that the defense attorney said that if he were not present at the time the jury completed deliberation, he waived the privilege of being present. Whether counsel was absent in fact at that time or at the time of passing of sentence is not shown by the record. In any event, this was a case in which the jury determined the sentence. It is difficult to see how the petitioner could have been prejudiced by the absence of his counsel at sentencing. The error, if any, was harmless.

From a consideration of the entire record in this case, I conclude that the asserted trial errors, either singly or in their totality, did not serve to deprive the petitioner of any of his constitutional rights. Relief must therefore be denied. An appropriate order will be entered this day.